Good morning. I'm Kari Hong. I'm appearing for Petitioner Haikwang VU. Mr. VU, in 2005, presented a substantial motion to reopen to the BIA. In this motion, he submitted a lengthy brief and over 400 pages to establish that his prior three attorneys had denied him effective assistance of counsel. His hearing attorney, or trial attorney, Mr. Sowers, failed to fully present his case and fully present him before the immigration judge. His appellate attorney, Mr. Rodriguez, forfeited his appeal in its entirety by filing a late notice to appeal. And Mr. Encinas, who prepared his motions to reopen before the BIA, denied him effective assistance of counsel by failing to present his full and complete request for relief. In 2005, the BIA reviewed all of this evidence and made three errors in denying it. The BIA denied by simply saying that Mr. VU was not diligent. The only reason that the BIA cited was that seven years had elapsed from the time of the final order to the filing of this particular motion to reopen. As the Ninth Circuit has held, the BIA must give specific and cogent reasons and must rely on a legal basis in determining whether diligence has met. Moreover, since Itaberea, a Ninth Circuit president, provides that during a period of time when an alien is represented by incompetent attorneys, the time to present his case is equitably told. The BIA ignored that precedent in finding Mr. VU was not diligent. Second of all, the BIA determined that equitable tolling was not available to Mr. VU because there was no showing of fraud by his previous attorneys. There is no precedent for a requirement that the prior attorneys who are otherwise incompetent must have engaged in fraud. Such a deviation from law is not supported in Itaberea, which expressly defines that equitable tolling is extended to lawyers who commit deception, fraud, or error. And also the facts of the case in Itaberea, although it also involved a situation in which an attorney fraudulently represented the attorney, the facts of the case also mention that the attorney was prima facie incompetent by failing to meet deadlines. Let me just take you back in terms of, I think that we know, it's got a very long procedural history, but I think we all spent a lot of time on that. But there's a couple of things that, as we start back on the first hearing that occurred at the beginning of this, Mr. VU testified, and the IJ made an adverse credibility finding, correct? Yes. And essentially, when I look back at that hearing, what I see there is he basically, if the IJ had not made the adverse credibility finding, if he had been found credible, I think he clearly would have had persecution by being locked in jail for two years and any number of things. But there were things that came out in that hearing, which I see as problematic in the other issues that we deal with. Problematic to the prong of prejudice, which you have to show when you're talking about incompetency of counsel. Say the failure to, no doubt, should have filed a timely appeal, if that's what he wanted to do. But you also have to be able to show that the result would have been indifferent. When I look at that, in the worst case scenario for you, what I look at there is Mr. VU was asked to go through, you know, what everything that happened to him. And he does talk about the two years. You know, he talks about basically his persecution as a Catholic. He doesn't know anything about being a Catholic, and that presented him with some issue. Not fundamentally about communion, the Father, Son, and the Holy Spirit. You know, any of the things that are pretty fundamental to being a Catholic, even second graders that go through their communion know those things. But he doesn't know any of those. He doesn't have any evidence that he went really to church there or that he's attending church here. I guess he says that he was afraid to go to church when he came here. He also has some problems with some documents. The court's got some problems with some documents in terms of his birth certificate. They have an altered document person as far as that goes. But essentially in the hearing, he's basically given the opportunity to say, okay, what, you know, what all happened to you? He's not cut off on any of that, and he gives his version of that. My concern is, yes, maybe if he had had a better attorney, his attorney could have told him, you know, those facts aren't going to get you asylum, or these things are going to get you a problem. But if he, that's what his story is, the fact that someone could have said, well, that's not going to work. I think we need to have it on the basis of politics, or you don't know enough about, you better know something about Catholicism before you get in there. All of those things are, you don't have a right to a lawyer that tells you if you say that, that's going to cause you problems. You have a right to a lawyer, you know, that basically, if that's what the truth of it is, and the judge made adverse credibility findings, how's he ever going to do better? He's always stuck, even if he gets a new trial, and let's say that someone prepares him better, and he says, well, you know, now I know about Catholicism, or now I know, you know, I can tell you more about the politics and all of that. He's still going to, he's still got to deal with what he said before anyone coached him, as it were. He still has to deal with those documents that he had before. You know, how's he ever really going to get a different result? You know, and why isn't this just a situation with, okay, if he would have been better prepared, maybe the IJ wouldn't have thought that he was a liar, but if there aren't really the facts there, you don't have a right to an attorney that can make up an asylum claim for you. That's a very good question. There's three points I'd like to. I mean, I just want to put that out there because I kind of, there's that lurking there. It's been seven years. He did have, you know, and I would grant to you that, you know, clearly it's just easy to say. You know, he didn't file a notice of appeal. That's, you know, that's a problem. He did have a full hearing on his motion to reopen at some point, but then there's all these other things that go on as well. In response to the problems at the immigration hearing, what a competent attorney could have done is what the question is. And as a preliminary matter, as a point of law, I'd like to point to the Ninth Circuit cases, Lynn Rio Barrios and Glynis Aguilar, which provide that prejudice in the immigration context is defined as probably affected the outcome. So it's, I'd like to start at that point as a matter of law. But I guess I'm struggling with how much, you know, if you are in fact persecuted, some of these are really fundamental type of things. He was given an opportunity to talk, albeit without probably very good coaching. But, you know, if you get locked up in prison for two years, you know, why would he know now any more about what he knew then about why you were locked up? That's the kind of thing that would cause someone to think about it. Or if you say that you were, you know, I mean, if really the whole thing was you were Catholic, and that was the problem, why wouldn't you know why people were persecuting you? There are three issues. One, the immigration judge did not find any discrepancy on his description or testimony involving the actual torture, the arrest, the reeducation camp that he was sent to two years, the arrest warrant that was issued calling him a traitor. The immigration judge did not have a problem with that. The adverse credibility finding was on the basis that she didn't believe he was a Catholic. A competent attorney would have objected to that on the basis that that's not a legitimate basis to find someone not credible. There's a Seventh Circuit case. Well, there is a Seventh Circuit case. But on the other hand, if you're claiming persecution on behalf of religion, you can't badger the witness or you can't do certain things as far as, you know, you can't bring the Pope in and cross-examine them. But don't they have to be Catholic to get the benefit of that? Well, I think what the Seventh Circuit case articulates well is that our conception of what is Catholic in the United States is very different than what is Catholic for someone in Vietnam who's lived under a communist regime that arrests priests, that determines which bishops are there, monitors the content of the sermons, all of this is in the country reports. And so the knowledge and availability and the assumption of what is Catholic is not universally known. And the immigration judge made a mistake by trying to put in a pop quiz to say whether he could name the three people in the Holy Trinity. But now doesn't he want to say it was based on politics that he was persecuted? What he's saying is that his promotion of religion and democratic ideals is a form of both religious persecution and a basis on his political opinion. There is country condition reports that shows that the Vietnamese government considers religious activists to be a threat to the government order because any expression of free thought is an expression to their control over the people. I would like to point out the first question of what could have made a difference is that the immigration judge expressly said that Mr. Vu was also not credible because he failed to provide corroborating documents and he failed to provide country condition reports. What we did in 2005 is provide a substantial number of country condition reports that showed an uncanny similarity of similarly situated people to Mr. Vu are persecuted in the exact ways that he describes. And also Vietnamese citizens who return to the country are placed under heavy monitoring because of their overseas ties and that's exactly what Mr. Vu said was his fear of returning. How about his documents? Well, the immigration judge had one problem. No, I think there was more than one because there was his birth date and it was a copy of it. Then there was an altered school thing, they have an altered document. And then there's later that he says he dropped out of school. And so, I mean, there's some real identity problems there. Right, and a competent attorney would have resolved that. The competent attorney did not have any of the originals present to the immigration judge. How do you resolve the altering that someone like drew on it? Well, there's a question of did that happen. The forensic expert did not show whether that altering was done by Mr. Vu, whether it was done at the office that issued the student identification card. A competent attorney would have been able to determine how relevant that evidence is to his claim. And because it was irrelevant to his claim that he was placed, he was tortured and placed in a reeducation camp, it's questionable how that's relevant at all to his case and why that was even presented. As for corroborating documents, what we provided in 2005 was a medical report showing that he had a scar on his back from the torture he experienced. We also had a very detailed psychological report by Dr. Barthold that showed that he wakes up screaming with nightmares, that he has symptoms of PTSD, post-traumatic stress disorder, that match exactly the events, the persecutory events that he described at court and that described to the doctor. And also, this particular doctor testified that this is an individual who does not respond well to open-ended questions, that he is suffering due to his trauma from avoidance. He does not voluntarily talk about these details that plague him, that keep him fearful from leaving his house. He does not go to church for that reason. He does not leave his house for that reason. A good, competent attorney would have been able to present this evidence to show the level of fear that he has experienced and how that is tied to the torture and why that shows both a past persecution and that he has a well-founded fear. Let me ask you a question about the interpreter problem in this case. What's your view about that? Well, once again, I think that was an issue that he should have an appeal. At a minimum, he should be able to present an appeal to raise the translation problems. Also, I believe that a competent attorney at the hearing should have cut off the hearing at that moment when it was clear that the translation problems were at such a high degree that no one in the courtroom was able to understand crucial testimony. As you recall in the brief, I mentioned there's one point where there's a member in the audience that objected to the deficiency of the interpretation. There was an off-the-record discussion after which the judge said, someone brought to my attention that the interpreter is not adequate. Nonetheless, we're going to go forward today. A competent attorney would have stopped right there and made sure that there was a competent translator in the courtroom. It's significant that the translation issue was a problem because another reason that the IJ expressly relied upon in denying relief is that she said, quote, Catholic people should not be struck is a sentence that does not make sense. In the opening brief, I put in the excerpts of the sentence where no one understands what the word struck means. The INS attorney has to ask for a playback because no one understands what the word struck is. The immigration judge asked Mr. Vood to explain what the word struck means and he's unable to provide a clear answer. And what's clear from the excerpt on page 8 of the first brief is that there's a miscommunication. It's an incoherent, nonresponsive discussion. And it's hard to tell whether the translator is not properly translating the word struck into Vietnamese or the problems of Vietnamese into English. Regardless, it was a material mistake. It was directly tied to the translation, and a competent attorney would have been able to object that and protect Mr. Vood from being adversely impacted. So just to boil all this down now, you've identified what you eloquently described as problems in the initial hearing. We also then have the fact that the appellate second number, appellate attorney one, but attorney number two in the sequence, fails to file an appeal. Now that carries with it a, that failure carries with it a presumption of prejudice that's rebuttable. What are you asking us to do in the sequence of errors? What is it that we are supposed to do? To find that this should go back to the BIA to have a hearing on something or to kick it back to the IJ or what? I'd like to reserve time, so I'll answer that briefly. It's better you answer my question than reserve time. Thank you. What's most important is to look at the 2005 motion to reopen, because we feel that that's the only time that he had an opportunity to present his claim fully. On that basis of the record, by looking at Moravilla, the BIA failed to ask would a competent attorney have acted differently at any course below, and the answer to that is yes. And was there prejudice, which we also argue is yes. Under the Moravilla analysis, the BIA erred. Under Mohammed, the Ninth Circuit has the authority in this situation, because these issues were squarely presented to the BIA, to have the authority to examine the record and determine whether there's a plausible basis for asylum, a plausible basis for withholding, a plausible basis for CAT, because all of that has been met. So you want us to sit as a three-judge BIA and decide on the merits that he's entitled to asylum? No. Under Mohammed, what the direction is the Ninth Circuit can remand it to the BIA with directions to reopen the case for Mr. Vu to have a new hearing. Before the IJ. Before the IJ. All right. Thank you. May it please the Court, Your Honors. My name is Robin Bley. I represent the Attorney General in this matter. The BIA did not abuse its discretion when it denied either of these motions to reopen that are before you. The petitioner had the opportunity to have a full and fair hearing before the immigration judge. He also appeared before an asylum officer, and he presented his case to the BIA. Not directly, but he did have an opportunity through a motion to reopen to present his case to the BIA after it had been reconsidered by an immigration judge. None were persuaded that he deserved the protection of asylum or relief or protection under CAT. Petitioner has basically tried to bolster his claims that he started in 1998, but has been unable and has argued that current counsel, if he had them at the time, he would have had better representation and he would have been granted the relief he was requesting. Well, I suppose we could all stipulate that he's got better counsel now than he's ever had. Well, that may be true, Your Honor, but that's not necessarily the standard. So, you know, that's kind of the standard he seems to want to apply. In the initial hearing, he was represented by Mr. Sowards. He went through the whole asylum process with him, asked questions, asked questions of the forensic expert. You know, at one point, Mr. Vu was asked by the immigration judge very open-ended questions. Why are you asking for asylum? What was the quote? We presume that's what he was asked. No, Your Honor. In the record, there's indication in the hearing, in the hearing transcript, what the immigration judge asked. I understand what the immigration judge said. What did the interpreter say? Oh, I'm sorry. I didn't understand your question. Your Honor, yes, we presume that there was no problem with the translation and that he did answer. He did respond. He just didn't respond with a lot of information. He didn't elaborate. His answers were short, very short. Those are the way we often tell our witnesses to answer questions when you're being examined. Answer the question asked and don't volunteer. Well, Your Honor, when you're asked a question, why are you asking for asylum, that's not – that question doesn't indicate that you're going to answer very shortly. I'm asking for asylum because I'm scared to death of going back to my country. End of answer. Well, that could be, Your Honor, I guess, but I would probably say I'm scared to go back because I am a member of this group that I was handing out flyers, which he doesn't really elaborate on. If your attorney had properly prepared you for answering the question, maybe you would.  Your Honor, I mean, because he didn't answer doesn't mean answer the way we might have thought was a better answer doesn't mean his attorney didn't prepare him. My initial question goes back to the validity of the interpretation he was being given throughout the hearing. How do we know that the interpretation was anywhere near being correct? Your Honor, we believe that it was because he answered the questions that were asked. The only problem, real problem in the record, which the immigration judge noted in her decision was the whole thing about Catholics being struck. They attempted on several occasions to clarify that, but they were unable to resolve that problem. But there's no indication that that one problem would have turned the way the case went. He also had the credibility problem. He was found to be not credible. He had presented a fraudulent document. He did not present valid originals of his documents. At one point, the immigration judge during the July 1998 hearing said, this is not a quote, but basically said please bring your birth certificate because he had indicated during the hearing that he had an original in San Jose where he lived, and the immigration judge said you should bring that. He never brought it. We never saw an original of that document at any time. Wasn't there something about it getting burned? He burned it? I believe that referred to the arrest record. Okay. Yes, and there's some conflict about whether he brought that to the United States and then burned it or burned it in Vietnam, how he obtained the copies. I mean, every time he's filed a motion to reopen, he's filed a declaration, and the declaration causes more conflicts. It doesn't resolve things any further. It just raises more questions about credibility. What about the religious question? I sat with Judge Newman of the circuit on a panel where we had a very similar case, and the I.J. examined, much like this I.J. did, in this case a Chinese immigrant, and found that the person didn't know the basic tenets of Catholicism, and Judge Newman is a Jesuit scholar among other things, and he took great umbrage at the conclusions of the I.J. because, as a Jesuit scholar, he could understand the concepts that the immigrant witness was testifying to, even though the I.J. didn't understand them because they weren't expressed in American concepts of Catholicism. And I read this transcript, and I get very nervous because I'm not a Catholic, but I've been to Mass, and I know some fundamentals, but I don't know whether I, having that much exposure, would be able to quote or tag the basis for a true Catholic response. So how much leeway should we give to the I.J.'s in deciding whether somebody is a qualified Catholic? Well, Your Honor, I'm not Catholic either, but I did ask some questions of people that I know who are Catholic, just to kind of understand what happens in the Church here. Vietnamese or American? No, American, but just to kind of understand what was kind of basic, fundamental things that they were taught in the Churches here. And just from my experience of going to Mass, and I've only been a couple of times, my experience has been that they go to communion every time that they... We do in America, but we're talking about Vietnam under a communist regime. Yes, Your Honor, but... In China, we know our cases are established. They don't practice in the rural communities in China. They don't practice Christianity or Catholicism the way we do here because they can't, they're persecuted. But there's nothing to indicate that he didn't practice that way in Vietnam. The country reports don't indicate that they can't practice Catholicism as we all understand it or know it, speaking as a lay person. To me, that's more relevant than either your or my personal American experience, because that's the problem. So you say the country reports that were in evidence disabuse the notion that... I'm sorry. They just don't indicate that the normal practices of Catholicism that's experienced throughout the world are not done in Vietnam. I mean, he also was not really able to talk about Mary. He did seem to understand some concepts about Mary, but he was not able to really elaborate on that. At some point in the record, he indicates that he went to catechism. He should have been able to present a little more evidence that he was Catholic than what he presented. Are the IJs given any guidelines as to particular religions so that there's some minimal level of Catholicism or evangelical Christianity or Jehovah's Witness faith so that they're not straying over into their own personal ideas of what any of those claimed religions should know as opposed to what the case law has established is fair? I cannot answer that. I do not know for sure. As I indicated, the record shows that he was asked open-ended questions, and he just provided short answers that were devoid of detail. Again, I'm troubled by that because people given open-ended questions don't always know what to go into. It's been a while since I looked at the transcript, and there is this difficulty with the translation. It's pretty garbage. So when you say he was given open-ended questions. Well, specifically, Your Honor, I think really the important open-ended questions that he was asked was when the immigration judge said, why did you come to the United States and why are you seeking asylum? I mean, that was his opportunity to present his evidence. The fact that he didn't, he doesn't get to try and try and try again. How did he know that? Did the court tell him that? No, Your Honor, but I mean. Did the court say, can you give me more detail? Can you explain more than just what you said? Not from the transcript, no. She didn't say, the immigration judge didn't say that. Moreover, his motion to reopen was subject to the time and numerical limitations. He had already submitted one motion to reopen, and the board denied that for finding that he had gone over the numerical limitations. Well, if there's ineffective assistance of counsel, I think there's authority in our circuit at least that you get equitable tolling on that requirement if there's, in fact, IHC or something. Yes, Your Honor. But in this case, I would point out that his last board decision, his second to the last in this instance, his second to the last board decision was in February 2004. He waited until January 2005 to even try and attempt to get counsel or anything or to seek another motion to reopen or anything like that. He didn't file his motion to reopen after talking to counsel in January 2005 until June 2005. I mean, at some point, you know, he has to be held responsible for not moving his case along and pursuing his case. Which counsel did he find in 2005? In 2005, he found current counsel. He had three, how many, three bad lawyers or four bad lawyers by then? Three bad lawyers, according to him, yes. He doesn't seem to produce always the best results. Well, Your Honor, whether he does or not, I mean, he was aware of the fact that he had been denied his claim almost a year before he sought other counsel. So I think he wasn't very diligent in that and that the board's finding that he didn't show diligence should be sustained. If there are no further questions, we'd ask that the petitions for review be denied. Okay. Thank you. Two quick points. I'd like to bring to the Court's attention that the immigration judge did not find Mr. Vu not Catholic, but, quote, seems to have very little knowledge about his own religion. I think that's important because she's not questioning whether he's Catholic, but he's not Catholic in the way she expects and wants him to be. As a second point with respect to diligence, the immigration or the BIA did not say what the lack of diligence is. The attorney just now imputed that somehow there was an improper delay from the time that we took the case. The BIA did not find our motion to reopen not timely. It was 90 days from the day that we reviewed the record. We spoke to Mr. Vu. We determined that there's a number of facts not into the record, and we submitted a timely MTR. As the Court is aware, the day that we found this out, we tried to stop these proceedings in the Ninth Circuit. We filed for a motion to stay the first briefing, to allow the MTR to be filed, and to allow Mr. Vu to have a full and fair hearing. The only reason that we did not get this earlier is that Mr. Vu was being represented by Mr. Encinas in the Ninth Circuit appeal, which was timely filed in 2004. In January 2005, he looked for his own attorneys. He came to us, and we took care of it. Mr. Vu was always represented by attorney, always had a pending case from 1998 until the present. Okay. Thank you. I appreciate the argument on both sides. Well argued, and we will submit the Vu case, and we will stand in recess for the day.
judges: Fisher, Callahan, Collins